UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMIAH M. JOHNSTON CDCR #AZ-0346,<br><br>                    Plaintiff,<br><br>          vs.<br><br>RALPH   DIAZ;   SCOTT   KERNAN; DANIEL PARAMO; PAT COVELLO; LT. RODRIGUEZ; D. HOUGH; S. CHAT; D. JAIME; JANE and JOHN DOES 1 THROUGH 8,<br><br>                    Defendants. | Case No.:  3:19-cv-00616-AJB-BLM<br><br>**ORDER:**<br><br>**GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [ECF No. 27]** |

Jeremiah Johnston, ("Plaintiff"), currently incarcerated at Richard J. Donovan Correctional Facility ("RJD") in San Diego, California is proceeding pro se and in forma pauperis ("IFP") in this civil rights action pursuant to 42 U.S.C. Section 1983.  (ECF No. 10, FAC.)  Plaintiff alleges that Defendants, officials from the California Department of Corrections and Rehabilitation ("CDCR"), the past and present wardens of RJD, and four correctional officers violated Plaintiff's rights under the First, Eighth, and Fourteenth Amendments.  (*See generally* FAC.)

Currently before the Court is Defendants' motion to dismiss Plaintiff's First Amended Complaint.  (*See* ECF No. 27.)  Defendants contend that Plaintiff fails to state a claim upon which relief may be granted or, alternatively, that Plaintiff's claims are barred by qualified immunity.  (*See generally id.* at 2.)  Plaintiff has filed an opposition and Defendants have filed a reply.  (*See* ECF Nos. 36, 38.)  Having carefully considered Plaintiff's First Amended Complaint and the parties' briefs, the Court **GRANTS** Defendants' motion to dismiss Plaintiff's First Amended Complaint with leave to amend.

## I.    Background

### A.  Plaintiff's Allegations

Plaintiff, a physically and developmentally disabled prisoner, alleges that upon his arrival at RJD in late 2017, he was placed into the "Enhanced Outpatient Program" ("EOP") by Defendant Paramo, who was then the warden of RJD.  (*See* FAC ¶ 4.)  He was subsequently assigned to C-Yard, a "Level 4 institution," which is "the highest general custody classificatio[n] of CDCR."  (*See id.* at ¶ 10.)  Although RJD contains several other yards at various levels of classification, two others are important to Plaintiff's case:  A-Yard, which is a "Level 3 general population" yard, and B-Yard, which is a "Level 3 Sensitive Needs Yard (SNY) or protective custody prison area."  (*See id.*)

Plaintiff's claims arise out of Defendants' implementation of a program to integrate sensitive needs and general population yards into merged yards, referred to by the CDCR as "non-designated programming facilities."  (*See id.,* at ¶ 5, 10; *see also* ECF No. 28, at Ex. 1 (frequently asked questions document from CDCR discussing non-designated programming facilities).)  Plaintiff claims that these non-designated programming facilities "mix[] sensitive needs and general population inmates together under the pretext of adding rehabilitative programs for inmates," but have in fact resulted in "riots, violence and death."  (*See* FAC ¶¶ 11, 16.)

Plaintiff alleges that he was raped by "his assigned or 'integrated' cellmate" shortly after his placement in C-Yard in late 2017.  (*See id.*)  After reporting the rape, Plaintiff alleges he was "rewarded with a placement into administrative segregation (ad seg) on B-

yard [as] a purely punitive housing assignment." (*See id.*)  Shortly thereafter, Plaintiff was "confronted with an Institutional Classification Committee (ICC) and instructed to move to A-Yard prison, a general population Level 3 prison." (*See id.*)  After Plaintiff refused to be transferred to A-Yard on the advice of his treating psychologist, he was assigned to Unit 9 of B-Yard, a Level 3 sensitive needs yard facility. (*See id.*)  Plaintiff alleges that the portion of B-Yard to which he was assigned "has not had riots, or any other major disturbances" and has "little if any gang related problems" since his assignment there. (*See id.* at ¶ 13.)  Nevertheless, "[s]ince 'Integration' commenced . . . because of the problems on other yards . . . B-Yard Units 8, 9 and 10 have received virtually no 'programming' . . . in the last seven (7) months." (*See id.*)  Additionally, "Plaintiff and all of his Unit 9 fellow prisoners have been on an unjustifiable lock-down for at least 5 weeks for no reason at all caused by B-Yard prisoners . . . and this lockdown was caused directly as a result of defendants['] attempts to 'Integrate' E, D, and C-Yards, as well as a major riot on A-Yard . . . ." (*Id.* ¶ 14.)

Plaintiff received a citation for violating prison rules by refusing to be assigned to A-Yard. (*See id.* ¶ 16.)  Defendant Chat presented Plaintiff with the citation, called a "Rule Violation Report" or "RVR." (*See id.*)  Plaintiff was found guilty of the violation in a hearing before Defendant Lieutenant Rodriguez "that had been delivered by Defendant Hough." (*See id.*)  An investigative officer and staff assistant were provided to assist in Plaintiff's defense at this hearing, but refused to ask the questions Plaintiff suggested as they were "irrelevant to the proceeding . . . ." (*See id.*)

The First Amended Complaint alleges that Defendants Kernan and Diaz, the former and current Secretary of CDCR, adopted the integration policy, and knew or should have known that this policy "would cause others to inflict on Plaintiff the constitutional injuries alleged herein . . . ." (*Id.* ¶ 5.)  Defendants Paramo and Covello,[1] the former and current

---

[1] The First Amended Complaint refers to Defendant Covello as "Pat Cavello." (*See* FAC ¶ 6.)  Defendants returned a waiver of service listing the Office of Attorney General as "Attorneys for P. Covello,

Warden of RJD, are allegedly "directly responsible for giving the orders at RJD for developing and implementing the 'Integration' policies that have resulted in riots . . . and numerous physical and serious injuries sustained by prisoners . . . ." (*Id.* at ¶ 6 (emphasis omitted).)  Plaintiff also alleges that Defendant Paramo "directly participated and signed-off on Plaintiff's 602 appeals requesting relief from said actions/omissions."   (*Id.*) Defendants Rodriguez, Hough, Chat, and Jaime are correctional officers who allegedly conspired to place Plaintiff in "punitive solitary confinement" after he reported the rape by his cellmate.  (*See id.* ¶ 7.)  Additionally, these Defendants were responsible for the RVR after Plaintiff refused to be transferred to A-Yard.  (*See id.*)  Defendants Rodriguez, Hough, Chat, and Jaime also allegedly refused to respond to an administrative grievance Plaintiff filed after the rape occurred.  (*See id.*)  Finally, Plaintiff alleges that Jane and John Does 1 through 8 are "correctional officers, Associate Wardens, psychologists . . . , or Appeal Coordinators at RJD, and Institutional Classification Committee assembled for Plaintiff's classification to A-Yard . . . ."  (*Id.* ¶ 8.)

Plaintiff seeks a declaration that "Defendant's [sic] policies and procedures . . . especially the elimination of protective custody units in all California prisons [are] null and void as being extremely dangerous and constitutionally indifferent to its prisoners and Plaintiff's safety, and mental and medical needs at RJD . . . ."  (*Id.* ¶ 18.)  Plaintiff also requests an injunction preventing Defendants from "any attempts at retaliation against both Plaintiff and his legal assistant in any form for the bringing of this lawsuit; no transfers, no status quo alterations of any type, and no punishments of any type or form imposed upon

---

Defendant," (*See* ECF No. 26, at 2), and refers to him using that spelling throughout their briefing on this Motion.  (*See, e.g.*, ECF No. 27, at 10.)  Plaintiff also appears to agree that this is the correct spelling of Defendant Covello's name and uses it in his opposition to Defendants' Motion.  (*See* ECF No. 36, at 14.) The Court takes judicial notice based on numerous cases in this District that the correct spelling is in fact "Covello," and **DIRECTS** the Clerk of the Court to correct the spelling of Defendant Covello's name in the caption.  *See, e.g.*, *Al Khafati v. Covello*, No. 3:19-cv-01811-LAB-LL, 2019 WL 6683194, at *1 (S.D. Cal. Dec. 5, 2019); *Green v. Covello*, No. 3:19-cv-1747-JAH-MSB, 2019 WL 6683196, at *1 (S.D. Cal. Dec. 6, 2019).

them for any reason without notice and a hearing" before the Court.  (*See id.*)  Separately, Plaintiff seeks an injunction barring the CDCR from implementing its integration policy "against Plaintiff or any other prisoner at any time."  (*See id.* at Prayer for Relief ¶ 2.) Plaintiff requests $5 million in compensatory damages and $5 million in punitive damages. (*See id.* ¶¶ 3-4.)  Defendants, with the exception of Defendants Paramo and Covello, are sued in both their official and individual capacities.  (*See id.* ¶¶ 5-8.)

### B. Procedural History

Plaintiff filed his initial Complaint and motion to proceed IFP in this case on March 29, 2019.  (*See* ECF No. 1, 2.)  Plaintiff simultaneously filed a motion for preliminary injunction.  (*See* ECF No. 5.) The Court granted Plaintiff's motion to proceed IFP and dismissed his initial Complaint sua sponte pursuant to 28 U.S.C. Sections 1915(e)(2)(B) and 1915A, concluding that Plaintiff failed to state a claim for which relief may be granted, and granted leave to amend to cure the deficiencies identified.  (*See* ECF No. 6, at 5-9, 12.) The Court also denied Plaintiff's motion for preliminary injunction.  (*See id.* at 10-11.)

Plaintiff subsequently filed the First Amended Complaint and a second motion for preliminary injunction.  (*See generally* FAC; ECF No. 12.)  In reviewing Plaintiff's First Amended Complaint pursuant to 28 U.S.C. Sections 1915(e)(2) and 1915A, the Court dismissed claims against Defendants M. Voong and Lobenstein for failure to state a claim. (*See* ECF No. 13, at 4.)   The Court found, however, that Plaintiff's First Amended Complaint "contain[ed] First and Eighth Amendment allegations against the remaining Defendants sufficient to survive the 'low threshold' for proceeding past the sua sponte screening required by 28 U.S.C. §§ 1915(e)(2) and 1915A(b).  (*See id.* at 5.)  Accordingly, the Court directed the U.S. Marshal's service to effect service on Plaintiff's behalf.  (*See id.* at 5.)  The Court further denied Plaintiff's second motion for preliminary injunction without prejudice.  (*See id.* at 6.)

Plaintiff filed a third motion for preliminary injunction, which the Court denied on June 23, 2020.  (*See* ECF No. 39.)  Among other things, the Court found that Plaintiff failed to establish a likelihood of success on the merits of his Eighth Amendment claim based on

Defendants' implementation of the integration program.  (*See id.* at 5.)  As the Court observed, "there is compelling evidence demonstrating that the program was not implemented with 'deliberate indifference' or with a 'sufficiently culpable mind' necessary for a viable Eighth Amendment Claim."  (*See id.*)  The Court made similar findings with respect to Plaintiff's Eighth Amendment claim stemming from the alleged rape by his cellmate, noting that "[n]othing in the case files made it apparent to Defendants that [Plaintiff and his cellmate] could not be safely housed together," and that "once this was reported, Defendants promptly took remedial action, and placed Plaintiff in administrative segregation for his safety while the incident was being investigated.  (*See id.* at 5-6.)

## II.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001); *Bryan v. City of Carlsbad*, 207 F. Supp. 3d 1107, 1114 (S.D. Cal. Mar. 20, 2018).

Because Rule 12(b)(6) focuses on the "sufficiency" of a claim rather than the claim's substantive merits, "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss," *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002), including the exhibits attached to it. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citing *Amfac Mortg. Corp. v. Ariz. Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978) ("[M]aterial which is properly submitted as part of the complaint may be considered" in ruling on a Rule 12(b)(6) motion to dismiss.) However, exhibits that contradict the claims in a complaint may fatally undermine the complaint's allegations. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (a plaintiff can "plead himself out of a claim by including . . . details contrary to his claims.") (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (courts "are not required to

accept as true conclusory allegations which are contradicted by documents referred to in the complaint.")))); *see also Nat'l Assoc. for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (courts "may consider facts contained in documents attached to the complaint" to determining whether the complaint states a claim for relief).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Villa v. Maricopa Cnty.*, 865 F.3d 1224, 1228-29 (9th Cir. 2017). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility requires pleading facts, as opposed to conclusory allegations or the "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, which rise above the mere conceivability or possibility of unlawful conduct. *Iqbal*, 556 U.S. at 678-79; *Somers v. Apple, Inc.*, 729 F.3d 953, 959-60 (9th Cir. 2013). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. While a pleading "does not require 'detailed factual allegations,'" Rule 8 nevertheless "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Therefore, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotes omitted); *accord Lacey v. Maricopa Cnty.*, 693 F.3d 896, 911 (9th Cir. 2012) (en banc). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences [drawn] from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962,

969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## III.   Discussion

To state a claim under 42 U.S.C. Section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Naffe v. Frye*, 789 F.3d 1030, 1035-36 (9th Cir. 2015).

Plaintiff's claims fall into three categories. First, he alleges that Defendants Kernan, Diaz, Paramo, and Covello were, in various ways, deliberately indifferent to Plaintiff's safety in violation of the Eighth Amendment. (*See* FAC ¶¶ 5-6, 11, 16.) Second, Plaintiff contends that Defendants Rodriguez, Hough, Chat, and Jaime retaliated against Plaintiff "when he exercised his First Amendment right to seek access to the prison legal system to file grievances after he had been assaulted and raped . . . ." (*See id.* ¶ 7.) Finally, Plaintiff alleges that Defendants Rodriguez, Hough, Chat, and Jaime violated his due process rights during his disciplinary hearing. (*Compare id.* ¶ 16 (listing Defendants Rodriguez, Hough, and Chat as being involved in his disciplinary proceedings), *with*, ECF No. 36, at 17 (suggesting that in addition to Defendants Rodriguez, Hough, and Chat, Defendant Jaime was involved in the alleged due process violations as well).) The Court will address each claim in turn.[2]

### A. Eighth Amendment

Plaintiff focuses his claims against Defendants Kernan, Diaz, Paramo, and Covello on alleged violations of the Eighth Amendment, specifically these Defendants' alleged "deliberate indifference" to Plaintiff's safety in adopting and implementing the integration

---

[2] In their motion to dismiss, Defendants also argued that any damages claims asserted against Defendants in their official capacities should be dismissed as barred by the Eleventh Amendment and the language of 42 U.S.C. Section 1983. (*See* ECF No. 27, at 25 (citing *Will v. Mich Dep't of State Police*, 491 U.S. 58, 70-71 (1989).) Plaintiff clarifies in his opposition that he pursues only injunctive relief through his official capacity claims. (*See, e.g.*, ECF No. 36, at 8-9; *see also id.* at 20.)

policy. (*See* FAC ¶¶ 5-6, 13-16.) These Defendants' actions fall into two categories: (1) Kernan and Diaz's alleged development of the integration policy as the former and current Secretary of the CDCR, and (2) Paramo and Covello's alleged implementation of that policy at RJD in their roles as the former and current Warden of the prison. (*See id.* ¶¶ 5-6.) Each pair will be addressed separately.

### 1. Defendants Kernan and Diaz

Defendants Kernan and Diaz are, as mentioned previously, the past and present Secretary of the CDCR. (*See* FAC ¶ 5.) Plaintiff alleges that they had "direct personal participation in the development of 'Integration' and set[] in motion a series of acts by other named defendants which both Kernan and Diaz knew or reasonably should have known would cause others to inflict on Plaintiff the constitutional injuries alleged herein . . . ." (*See id.*) The integration policy allegedly "eliminated all safety and protection of approximately 22% of at least 130,000 prisoners such as Plaintiff who have been convicted of a sexual crime, gave testimony against another, is small and weak, told on somebody in prison, rejected a gang affiliation, or who are mentally ill and/or medically, or physically handicapped." (*Id.*) Plaintiff alleges that the adoption of this policy has led to numerous riots and the related lockdown of Plaintiff and his housing unit. (*See id.* ¶ 14.) Additionally, Plaintiff alleges that he was raped "as a direct result of Defendants' 'Integration' scheme . . . ." (*Id.* ¶ 15; *see also id.* ¶ 16 (alleging that Plaintiff was "forcefully raped by his assigned or 'integrated' cellmate" in 2017).)

"'[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). "The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation is 'objectively, sufficiently serious' and (2) the prison officials had a 'sufficiently culpable state of mind,' acting with deliberate indifference." *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834). The second prong of this test is subjective, and "the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *See Farmer*, 511 U.S. at 837. "'Deliberate indifference entails something more than mere negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hearns*, 413 F.3d at 1040 (quoting *Farmer*, 511 U.S. at 835) (internal alterations omitted)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

As Defendants rightly point out, Diaz and Kernan cannot be held liable simply by virtue of their supervisory roles within the CDCR. This is because there is no *respondeat superior* liability under Section 1983. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." (emphasis in original)). As a result, in order to state a claim against Diaz and Kernan, Plaintiff must allege their "'personal involvement in the constitutional deprivation'" or "'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (quoting *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc), *abrogated on other grounds by Farmer*, 511 U.S. at 837).

Plaintiff's claims focus on Defendants Diaz and Kernan's adoption of a policy—the integration of general population and sensitive needs yards prisoners into merged, non-designated programming facilities. (*See* FAC ¶ 5.) According to Plaintiff "their causal connection to Plaintiff's injuries is established with their direct personal participation in the development of 'Integration' and by setting in motion a series of acts by other named defendants which both Kernan and Diaz knew or reasonably should have known would cause others to inflict on Plaintiff the constitutional injuries alleged herein . . . ." (*Id.*) Plaintiff does not specify how Kernan or Diaz "set[] in motion" those acts by other named Defendants, nor does he allege that either Defendant was involved in assigning Plaintiff or

10

his cellmate to an integrated yard or had any reason to believe that Plaintiff's cellmate posed a danger to Plaintiff.  As a result, Plaintiff has not alleged that Kernan or Diaz "kn[ew] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety," or that Kernan or Diaz were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." *See Farmer*, 511 U.S. at 837.  Nevertheless, these Defendants may be held liable "even without overt personal participation in the offensive act if [they] implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation."  *See Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal quotation marks omitted)).

A recent case in this district, *Montalvo v. Diaz*, No. 3:19-cv-00363-CAB-JLB, 2020 WL 3469365 (S.D. Cal. June 25, 2020) confronted a similar claim against two CDCR officials alleged to be responsible for the adoption and implementation of the integration policy.  In that case, the plaintiff alleged that he was assigned to two integrated yards at RJD where he was assaulted by inmates formerly assigned to sensitive needs yards.  *See id.* at *2.  According to the plaintiff in *Montalvo*, two CDCR officials, Diaz and Kathleen Allison, the Director of the CDCR's Division of Adult Institutions, authored a memorandum announcing the expansion of integrated facilities and spearheaded its adoption even though "such [integrations] have always resulted in violence when they have been attempted in the past."  *See id.* at *7.  Despite these allegations, the *Montalvo* Court dismissed Plaintiff's claims against the CDCR officials, concluding that these allegations were conclusory and did not demonstrate that the integration policy was "'so deficient that the policy itself is a repudiation of constitutional rights and [was] the moving force of the constitutional violation.'"  *Id.* at *6 (quoting *Hansen*, 885 F.2d at 646); *see also Mendez v. Diaz*, No. 1:19-cv-01759-NONE-BAM (PC), 2020 WL 1974231, at *5 (E.D. Cal. Apr. 24, 2020) (dismissing similar claims in part because "Plaintiff has not alleged any facts demonstrating that implementation of the [integration] policy would always violate the

Eighth Amendment, no matter which . . . inmates . . . or yards the policy was applied to.").
In so doing, the Court relied on a CDCR memorandum, incorporated by reference in the plaintiff's complaint, which explained "that the [integration of general population and sensitive needs yard inmates was] limited to 'inmates demonstrating positive programming efforts and a desire not to get involved in the destructive cycles of violence,' and that in order to be placed [in integrated yards], inmates must be 'advised of programming expectations and positive programming reasoning . . . .'" *Montalvo*, 2020 WL 3469365, at *6.

Although Plaintiff's allegations are superficially distinct from those in *Montalvo*, the same conclusion is required in this case. Plaintiff repeatedly asserts in conclusory terms that the integration policy is "insane," "pretext[ual]," "includes an unconstitutional[ly] excessive amount of violence, riots and death," and a "fiasco . . . being imposed on California prisoners." (*See* FAC ¶¶ 5, 11, 13.) But stripping away these "'labels and conclusions,'" as well as "'formulaic recitation[s] of the elements of a cause of action . . . ,'" *see Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), like Plaintiff's allegation that "Kernan and Diaz knew or reasonably should have known [that integration] would cause others to" injure Plaintiff, nothing is left to suggest that Kernan and Diaz were aware that inmates like Plaintiff would be attacked as a result of the integration policy, or that the policy categorically violates the Eighth Amendment. (*See* FAC ¶ 5.) At best, Plaintiff's First Amended Complaint alleges that the integration policy violates the Eighth Amendment because Plaintiff was assaulted by his cellmate and because riots, assaults, and other violence have occurred since the implementation of the policy.[3] But "not . . .

---

[3] Although Plaintiff alleges that there have been numerous incidents of rioting and violence since "December, 2017," (*see* FAC ¶ 14), he does not allege that these incidents occurred before the rape. (*See id.* ¶ 10 (alleging that Plaintiff was raped in "late 2017"); *see also id.* ¶ 16 (suggesting that the rape incident occurred in or around late December 2017).) As a result, the subsequent riots and instances of violence shed little or no light on Defendants' knowledge of the risks of harm inherent in adopting the policy, since neither Diaz nor Kernan would have been aware of them at the time the policy was adopted and implemented or when it allegedly harmed Plaintiff. *See Farmer*, 511 U.S. at 842-43 ("[T]he official must

every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *See Farmer*, 511 U.S. at 833.

The Ninth Circuit's decision in *Byerly v. Deputy Warden*, 246 F. App'x 512 (9th Cir. 2007) further illustrates the issues with Plaintiff's claim against Defendants Diaz and Kernan. *Byerly* involved a claim against the Acting Director of the Arizona Department of Corrections for injuries the plaintiff, a convicted sex offender, suffered after his arrival in prison. *Id.* at 513. The plaintiff alleged that the Acting Director had implemented a policy that "indiscriminately plac[ed] unclassified inmates together with those truly in need of protection during an initial evaluation period," which led to an attack on Plaintiff, violating his Eighth Amendment rights. *See id.* The Ninth Circuit affirmed the district court's grant of summary judgment for the Assistant Director, noting that the Director's "awareness of the likelihood of an attack on [the plaintiff] is severely limited because, as Acting Director of Corrections for the entire state of Arizona, she never had any actual contact with [the plaintiff]." *Id.* at 514. The Ninth Circuit then analyzed whether the policy under which the plaintiff was housed was "'so deficient that the policy itself is a repudiation of constitutional rights,'" concluding that Plaintiff's allegations fell "far short of th[at] hurdle" *Id.* at 514-15 (quoting *Redman*, 942 F.2d at 1446). The Court noted that there was no allegation "that [the Acting Director] herself actually knew or reasonably should have known that inmates like [the plaintiff] would be subject to attack during the initial evaluation period," and rejected the claim that her thirty years of experience as a corrections officer would make deficiencies in the policy obvious. *See id.* at 515. Additionally, the *Byerly* Court noted that the prison "had a set procedure in place to attempt

---

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *see also Jackson v. Paramo*, No. 17CV882-CAB (BLM), 2018 WL 4952596, at *7 (S.D. Cal. Oct. 12, 2018) (noting that evidence submitted and reviewed by warden during inmate appeals after an alleged incident did not show that warden "knew or should have known" that inmate faced serious risk of harm before the alleged incident occurred).

to provide inmates with protective segregation" as needed.  *Id.* at 515.

Like in *Byerly*, neither Diaz nor Kernan is alleged to have had any contact with Plaintiff.  *See id.* at 514.  The only support Plaintiff provides for his view that Diaz and Kernan should have known Plaintiff would be attacked by his cellmate is the conclusory allegation that they "knew or reasonably should have known [that the integration policy] would cause others to inflict" harms on Plaintiff, and the fact that such harm eventually occurred.  (*See* FAC ¶ 5.)  Plaintiff does not allege similar instances of rape or other violence that predate the attack by his cellmate that may have put Diaz or Kernan on notice that the integration policy was constitutionally deficient.  Although Plaintiff alleges that the integration policy "eliminated all safety and protection of approximately 22% of at least 130,000 prisoners such as Plaintiff," this conclusion is belied by Appendix A to Plaintiff's First Amended Complaint, which includes quotations from a CDCR frequently asked questions document regarding the integration policy, along with responsive allegations by Plaintiff.  (*See* FAC, App'x A.)  Defendants attach the underlying frequently asked questions document to their Motion and ask that the Court take judicial notice of its contents.  (*See* ECF No. 27, at 15; *see also id.* Ex. 1.)  Plaintiff does not object to that request, which is **GRANTED**.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (explaining that incorporation by reference is appropriate for "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to [the plaintiff's] pleadings.").  The document makes clear that assignment to integrated facilities is limited to "inmates demonstrating positive programming and a desire to not get involved in the destructive cycles of violence and criminal activity/thinking," and that inmates assigned to integrated facilities that "engage in violent or threatening behavior towards other inmates housed in an [integrated facility]" are subject to disciplinary sanctions and inmates with "enemy concerns" may be transferred.  (*See* ECF No. 27, Ex. 1, at 28, 30.)

Taking Plaintiff's factual allegations in response to the frequently asked questions document as true, as the Court must at this stage, they still do not demonstrate that

Defendants' integration policy is unconstitutional.  For example, although Plaintiff alleges that programming opportunities have not increased as a result of this policy, that some inmates refuse to program, and that violence has increased, he does not allege the criteria the CDCR set forth for placement in integrated facilities is inaccurate.  (*See generally* FAC App'x A, at 16-19.)  Similarly, although Plaintiff asserts that the CDCR's statements about disciplinary sanctions and transfer for inmates who have enemy concerns are "outright lie[s]," all he alleges in support of this conclusory statement is that violence occurs in integrated facilities and that the CDCR "could care less about administrative or even more criminal sanctions."  (*See id.* at 17-18.)  These allegations, like those contained in the body of Plaintiff's First Amended Complaint, fail to demonstrate that Defendants' integration policy would always violate the Eighth Amendment.  *See Montalvo*, 2020 WL 3469365, at *6 (citing a different CDCR memorandum containing similar information incorporated by reference into the complaint and noting that the memorandum undermined allegations that the integration policy was "'itself . . . a repudiation of constitutional rights' and . . . 'the moving force of the constitutional violation.'"  (quoting *Hansen*, 885 F.2d at 646)); *Mendez*, 2020 WL 1974231, at *5 ("Plaintiff has not alleged any facts demonstrating that implementation of the [non-designated programming facilities] policy would always violate the Eighth Amendment, no matter which . . . inmates . . . or yards the policy was applied to."); *see also Jackson*, 2018 WL 4952596, at *7 & n.1 (noting that allegations of deliberate indifference were "undercut" by exhibits Plaintiff submitted in connection with his second amended complaint and discussing the propriety of considering such documents and documents incorporated by reference in the pleadings in ruling on a motion to dismiss).  As a result, Plaintiff does not state a claim against Defendants Diaz or Kernan based on supervisory liability.

For the reasons set forth above, Plaintiff's First Amended Complaint does not state an Eighth Amendment claim against Defendants Diaz or Kernan.  Accordingly, Defendants' motion to dismiss these claims is **GRANTED**.

2. Defendants Paramo and Covello

1      Plaintiff also alleges that Defendants Paramo and Covello, the past and present
2  wardens of RJD, "are <u>directly</u> responsible for giving the orders at RJD for developing and
3  implementing the 'Integration' policies that have resulted in riots (8 of them since
4  December, 2017 and numerous physical and serious injuries sustained by their
5  prisoners . . . ." (FAC ¶ 6 (emphasis in original).)  Plaintiff also alleges that Defendant
6  Paramo "directly participated in and signed-off on Plaintiff's 602 appeals requesting relief
7  from said actions/omissions." (*See id.*)  In addition to these actions, which Plaintiff alleges
8  led to him being raped by his "assigned or 'integrated' cellmate," Plaintiff notes that he
9  and his fellow prisoners in B-Yard "have been on unjustifiable lock-down for at least 5
10 weeks for no reason at all caused by B-Yard prisoners," and that the lockdown is instead
11 the result of "defendants['] attempts to 'Integrate' E, D, and C-Yards, as well as a major
12 riot on A-Yard . . . ." (*See* FAC ¶¶ 14, 16.)  In Plaintiff's view, when taken in the aggregate,
13 these alleged actions violate his Eighth Amendment rights and demonstrate deliberate
14 indifference on the parts of Defendants Paramo and Covello. (*See* ECF No. 36, at 15-16.)

15     Defendants argue that these allegations do not demonstrate deliberate indifference
16 on the part of either individual. (*See* ECF No. 27, at 16-18.)  As Defendants point out, the
17 First Amended Complaint does not allege any facts suggesting that Defendants Paramo or
18 Covello were aware that Plaintiff's cellmate posed a risk to Plaintiff, or that either
19 Defendant was involved in the housing assignment of Plaintiff or his cellmate. (*See id.*)
20 Additionally, with respect to the allegation that Paramo "signed-off on Plaintiff's 602
21 appeals," (FAC ¶ 6), Defendants note that Plaintiff does not allege "that the 602 appeals . . .
22 related to any concern Plaintiff communicated about his cellmate before the rape, which
23 would have alerted Paramo to any safety concern." (*See* ECF No. 27, at 17.)  Finally,
24 Defendants argue that Plaintiff's placement in segregation and reassignment to B-Yard, as
25 well as the subsequent lockdowns of various parts of RJD,[4] do not demonstrate deliberate

26

27

28

---

[4] Defendants argued in their Motion that Plaintiff failed to state a claim predicated on the lockdowns independent from his allegations that the integration policy led to the alleged rape. (*See* ECF No. 27, at

indifference either, since those actions were taken to address the danger to Plaintiff by his cellmate and prison-wide safety issues, respectively. (*See id.* at 17-18.)

Plaintiff's allegations, taken as true, fail to state a claim against Defendants Paramo or Covello based on the integration policy. Plaintiff does not allege that Paramo or Covello were responsible for the assignment of Plaintiff or his cellmate to C-Yard, let alone that either warden had reason to believe that Plaintiff would be attacked there. (*See* FAC ¶ 6.) As a result, Plaintiff has not demonstrated that either "official [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference." *See Farmer*, 511 U.S. at 837. Additionally, any liability for implementing the integration policy fails for similar reasons Plaintiff's claims against Defendants Diaz and Kernan failed. Although Plaintiff alleges that negative consequences have flowed from the implementation of the integration policy, that does not demonstrate that the "policy [is] so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *See Hansen*, 885 F.2d at 646 (internal quotation marks and citation omitted); *see also Mendez*, 2020 WL 1974231, at *2, 4 (dismissing claims against warden predicated on "well-document incidents of violence" in integrated yards as failing to establish "that the policy to merge SNY and GP prisoners on all level 1 and level 2 yards into [integrated yards] is itself a repudiation of Plaintiff's Eighth Amendment rights."). On the contrary, and as explained previously, Exhibit A to Plaintiff's First Amended Complaint and the frequently asked questions document that it incorporates by reference demonstrate that placement in integrated yards is limited to "inmates that demonstrate positive programming, regardless of prior Sensitive

---

17-18.) Plaintiff clarifies in his opposition that "[t]he lockdowns were simply residual effects of Paramo and Covellos' [sic] implementation and promulgation at RJD of Diaz and Kernans' [sic] 'integration' policies on other yards of RJD, not B-Yard." (*See* ECF No. 36, at 16.) Thus, Plaintiff appears to argue that the lockdowns are relevant only to the extent they show that the integration policy itself is unconstitutional, and he only presses claims against Defendants Paramo and Covello based on their involvement in implementing that policy at RJD, not separately based on the other remedial actions taken by Defendants and others following the alleged rape.

Needs Yard (SNY) or General Population (GP) designation," and that inmates assigned to integrated yards who engage in violent behavior are subject to disciplinary sanctions or transfer.  (*See* ECF No. 27, at 28, 30.)  Although Plaintiff asserts that the CDCR's statements in this document are "outright lie[s]" and that integration was implemented "to create chaos and havoc," (*See* FAC at 17-18), these assertions, and much of the other information he includes in Exhibit A to his First Amended Complaint is vague and conclusory and falls short of demonstrating that the policy categorically violates the Eighth Amendment.  *See Berg v. Klincheloe*, 794 F.2d 457, 459 (9th Cir. 1987) ("The Supreme Court has stated that deference to the decisions of prison officials also extends to prophylactic or preventive measures intended to reduce the incidents of . . . breaches of prison discipline.").  Additionally, Plaintiff's claim that Defendant Paramo "directly participated and signed-off on Plaintiff's 602 appeals requesting relief from said actions/omissions" is too vague to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678 (explaining that "more than unadorned, the-defendant-unlawfully-harmed-me accusation[s]" are required to survive a motion to dismiss (citing *Twombly*, 550 U.S. at 555)).

Accordingly, Defendants' motion to dismiss Plaintiff's Eighth Amendment claims against Defendants Paramo and Covello is **GRANTED**.

## B. First Amendment

Plaintiff next alleges that Defendants Rodriguez, Hough, Chat, and Jaime "along with Jane and John Does 1 through 8," retaliated against him by placing him in "punitive segregated confinement after reporting the fact that he was being raped" by his cellmate. (FAC ¶ 7; *see also id.* ¶ 10 (referring to the placement into administrative segregation as "purely punitive . . . .").)  Shortly thereafter, Plaintiff appeared before the institutional classification committee, which directed him to be moved to A-Yard.  (*See id.* ¶ 16.)  After Plaintiff refused the housing reassignment, he received an RVR.  (*Id.*)  Plaintiff alleges that this RVR was further retaliation for his reporting regarding the rape.  (*See id.* ¶ 7.)  Finally, Plaintiff alleges that when he filed a grievance related to the rape, the grievance was

returned to him unadjudicated.  (*See id.*)

To state a claim for retaliation in violation of the First Amendment, Plaintiff must allege that: (1) he was subject to "adverse action" by a state actor, (2) because he engaged in (3) "protected conduct," and (4) that the adverse action "chilled [his] exercise of his First Amendment rights," and (5) "the action did not reasonably advance a legitimate correctional goal." *See Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (citing *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000); *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994)).  Protected conduct includes filing prison grievances or litigation against prison officials.  *See id.* at 568.  In order to demonstrate that the adverse action was "because of" Plaintiff's protected conduct, he must allege that "his protected conduct was 'the substantial or motivating factor behind the defendant's conduct.'"  *See Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Additionally, to allege that the adverse action did not "'advance legitimate goals of the correctional institution,'" Plaintiff must allege "in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious, or that they were 'unnecessary to the maintenance of order in the institution . . . .'" *Watison v. Carter*, 668 F.3d 1108, 1114-15 (quoting *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984) (internal citations omitted)).

Defendants argue that Plaintiff has not alleged a retaliatory motive or the absence of a legitimate correctional goal for the actions Defendants took.  Specifically, Defendants argue that Plaintiff cannot allege a retaliation claim based on the placement in administrative segregation following his report regarding the rape by his cellmate because CDCR regulations required Defendants to place Plaintiff in administrative segregation at that point.  (*See* ECF No. 27, at 19 (citing 15 Cal. Code Reg. § 3335.)  Defendants' argument is similar with respect to the disciplinary charge, which they argue was consistent with prison regulations.  (*See* ECF No. 27, at 20; *see also id.* at Ex. 1 ¶ 6 (frequently asked questions document from CDCR incorporated by reference in First Amendment Complaint

stating that if prisoners refuse to accept placement in non-designated programming facilities, "institution staff shall initiate the disciplinary process for Refusing Assigned Housing.").)  Finally, Defendants argue that Plaintiff has not alleged that "the reasons for screening and returning his inmate appeal were inconsistent with" 15 California Code of Regulations Section 3084.6, which sets forth grounds for rejection of inmate grievances. (*See id.* at 20 (citing 15 Cal. Code Reg. § 3084.6).)

Plaintiff's response to these arguments is brief and unconvincing.  Plaintiff suggests, based on a misreading of the Ninth Circuit's decision in *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2004), that he "does not need to demonstrate [any] retaliatory motives by these [D]efendants at the pleading stage . . . ."  (*See* ECF No. 36, at 17 (citing *Rhodes*).) That case, and specifically the language quoted by Plaintiff, does not stand for that proposition or otherwise excuse Plaintiff from pleading the essential elements of his claim. The language Plaintiff quotes relates to a separate element of a retaliation claim—chilling of Plaintiff's exercise of his First Amendment rights—and clarifies that a plaintiff need not allege a "total chilling" of those rights in order to state a claim of retaliation.  *See Rhodes*, 408 F.3d at 567.  Defendants do not argue otherwise, and instead correctly assert that Plaintiff has not alleged plausibly a retaliatory motive on the part of Defendants or the absence of a legitimate correctional purpose for their actions, which appear to be consistent with CDCR regulations[5] and overarching goals like ensuring Plaintiff's safety and

---

[5] Defendants' briefing twice includes the following quote (or a substantially similar quote): "'Investigation related to being the victim of a Prison Rape Elimination Act (PREA) incident requires placement in administrative segregation.'" (*See* ECF No. 27, at 19 (quoting 15 Cal. Code Reg. § 3335(a)(1)(D) (internal alteration omitted)); *see also* ECF No. 38, at 5 ("'Investigation related to being a victim of the Prison Rape Eliminary [sic] Act (PREA) incident requires placement in Administrative Segregation [sic].'" (quoting 15 Cal Code. Reg. § 3335).)  If Section 3335 ever included this language, it does not include it now, instead stating in relevant part that "Non Disciplinary Segregation (NDS) means temporary segregated housing placement for administrative reasons to include but are not [sic] limited to: . . . Investigation related to being the victim of a Prison Rape Elimination Act (PREA) incident . . . ."  *See* 15 Cal. Code Reg. § 3335(a)(1), (a)(1)(D).  The correct language does not alter the Court's conclusion—clearly placement in segregated housing following Plaintiff's allegation that he was raped by his cellmate serves a legitimate penological purpose, and Plaintiff does not plausibly allege otherwise.  Nevertheless, the Court urges counsel to take care to avoid such errors in the future.

maintaining order in the institution.  *See, e.g.*, 15 Cal. Code Reg. § 3269(h) ("If an inmate refuses to be housed as determined to be appropriate . . . the inmate shall be subject to the disciplinary process."); 15 Cal. Code Reg. § 3335(a)(1)(D) (providing for placement in non-disciplinary segregation during an investigation "related to being the victim of a Prison Rape Elimination Act (PREA) incident . . . ."); *see also Lucus v. Koenig*, 19-07938 BLF (PR), 2020 WL 4193369, at *3 (N.D. Cal. July 21, 2020) (holding that consequences, including placement in administrative segregation, for refusal to be rehoused pursuant to integration policy did not state retaliation claim where CDCR memorandum "clearly indicated that there would be consequences for non-compliance with rehousing . . . ."). Indeed, Plaintiff alleges no motives whatsoever for Defendants' alleged retaliation.  (*See generally* FAC.)  And although the First Amended Complaint suggest that Defendants' actions did not "advance or further any legitimate penological purposes, [because] Defendants' 'Integration' policy serves no valid penological purpose," (*see id.* ¶ 7), that allegation at best pertains only to the RVR for refusing to be assigned to A-Yard, and not Plaintiff's segregation following the alleged rape or the return of Plaintiff's grievance, neither of which involved the application of the integration policy.

As a result, Defendants' Motion to Dismiss the First Amendment retaliation claims against Defendants Rodriguez, Hough, Chat, and Jaime is **GRANTED**.  Additionally and for the same reasons, the Court finds that Plaintiff has also failed to allege retaliatory motive and absence of legitimate penological purpose with respect to the retaliation allegations against Jane and John Does 1 through 8.  (*See id.*)  Accordingly, these claims are dismissed sua sponte for failure to state a claim.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (providing that "the court shall dismiss . . . *at any time*" allegations that "fail[] to state  a claim on which relief may be granted . . . ." (emphasis added)).

### C. Due Process

Plaintiff's final claim pertains, as did part of his First Amendment claim, to the RVR he received for refusing a housing assignment on A-Yard.  (*See* FAC ¶ 16.)  As mentioned previously, Plaintiff alleges that after the alleged rape he appeared before the Institutional

Classification Committee.  (*See id.*)  The Committee instructed Plaintiff to move to A-Yard, "a general population Level 3 prison."  (*Id.*)  Plaintiff refused to move based on his psychologist's advice that "he would not be safe with all the violent gang members and life termers on that yard."  (*Id.*)  Plaintiff was then issued an RVR which was "delivered" by Defendant Chat.  (*See id.*)  "On February 27, 2018, a hearing was held by Defendant Lt. Rodriguez that had been delivered by Defendant Hough."  (*Id.*)  An investigative officer and staff assistant were provided to assist in Plaintiff's defense, but they refused to ask the questions Plaintiff suggested, concluding that they were "irrelevant to the proceedings." (*See id.*)  Plaintiff was found guilty of the violation, but does not allege what consequences, if any, he suffered as a result.  (*See id.*)

The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). "To state a procedural due process claim, [a plaintiff] must allege '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.'" *Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).

A prisoner is entitled to certain due process protections when he is charged with a disciplinary violation.  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564-571 (1974)).  "Such protections include the rights to call witnesses, to present documentary evidence and to have a written statement by the fact-finder as to the evidence relied upon and the reasons for the disciplinary action taken." *Id.*; *see also Wolff*, 418 U.S. at 566 (explaining that an inmate must be afforded an opportunity "to call witnesses and present documentary evidence in his or her defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.").  These procedural protections adhere, however, "only when the disciplinary action

implicates a protected liberty interest in some 'unexpected matter' or imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Serrano*, 345 F.3d at 1077 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003)).

Defendants argue that Plaintiff's due process claims should be dismissed because Plaintiff has not alleged the denial of a liberty interest protected by the Constitution. (*See* ECF No. 27, at 20-21.) "[Plaintiff] alleges neither a credit loss that would affect the duration of his confinement nor some other hardship that is atypical and significant compared to those posed by [the] normal conditions of confinement." (*See id.* at 21.)  As a result, Defendants conclude, Plaintiff cannot demonstrate that the procedural protections outlined above applied to his RVR proceedings. (*See id.*)

In his opposition brief, Plaintiff outlines the specific credits and privileges he lost as a result of being found guilty of the RVR. (*See* ECF No. 36, at 17.)  These facts do not appear in the First Amended Complaint, and thus are not properly before the Court for purposes of this Motion. *See Schneider v. Cal. Dep't of Corrs.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." (emphasis in original) (citations omitted)). In the absence of such allegations, the Court finds that Plaintiff has not alleged that he was a denied a liberty interest that would trigger due process protections.  As a result, Defendants' motion is **GRANTED**.

In closing, the Court notes that if Plaintiff had made such an allegation, his claims against Defendants Hough and Chat for "delivering" the RVR or the hearing would nevertheless fail. (*See* FAC ¶ 16.)  It is unclear what it means to "deliver" an RVR or a hearing, but it is difficult for the Court to imagine a way in which doing so could violate due process, at least based on the facts Plaintiff has asserted to date.  Finally, although leave to amend will be granted with respect to this claim, "some evidence" is all that is required to support a disciplinary decision, *see Superintendent v. Hill*, 472 U.S. 445, 455

(1985), and more importantly, some courts have concluded that the loss of good time credits, visitation privileges, or the assessment of points on an inmate's record may not by themselves constitute atypical and significant hardships. *See, e.g.*, *Salinas v. Montgomery*, No. 3:19-cv-0744-AJB-RBB, 2019 WL 2191349, at *5 (S.D. Cal. May 21, 2019) (alleging that an inmate was "assessed a good-time credit loss of 90 days" was insufficient to show atypical and significant hardship); *Contreras v. Herrera*, No. 3:18-cv-00717-MMA-AGS, 2018 WL 4961510, at *5 (S.D. Cal. Oct. 15, 2018) (losing visitation privileges for six months is not an atypical and significant hardship); *Meeks v. Nevada*, No. 3:10-cv-00558-RCJ-RAM, 2011 WL 221774, at *4 (D. Nev. 2011) (adding points to an inmate's record, even if they made it impossible to transfer to less restrictive prison, are not an atypical and significant hardship). Plaintiff should take these issues into account in evaluating a potential amended pleading.

## IV. Leave to Amend

As mentioned, in light of Plaintiff's pro se status, the Court grants Plaintiff leave to amend to cure the deficiencies in his claims against Defendants, if he can. *See AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("Rule 15(a) is very liberal and leave to amend shall be freely given when justice so requires." (quotation omitted)).

Plaintiff's Second Amended Complaint must be complete in itself, without reference to Plaintiff's original pleading, and any claims Plaintiff fails to reallege against any of the Defendants will be considered waived. *See* S.D. Cal. Civ. L.R. 15.1; *Lacey*, 693 F.3d at 928 (noting that claims dismissed with leave to amend that are not re-alleged in an amended pleading may be "considered waived if not repled"); *Hal Roach*, 896 F.2d at 1546 ("[A]n amended pleading supersedes the original.").

## V. Conclusion and Orders

Accordingly, the Court:

///

///

(1)     **GRANTS** Defendants' Motion to Dismiss Plaintiff's claims[6] (ECF No. 27);

(2)     **GRANTS** Plaintiff **forty-five (45) days** leave to file a Second Amended Complaint.  If Plaintiff fails to file a Second Amended Complaint within the time provided, the Court will enter a final order dismissing this action in its entirety based both on Plaintiff's failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and his failure to prosecute in compliance with a court order requiring amendment.  *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action."); and

(3)     **DIRECTS** the Clerk of Court to correct the spelling of Defendant Covello's name in the caption.

**IT IS SO ORDERED**.

Dated:  September 21, 2020

Hon. Anthony J. Battaglia
United States District Judge

---

[6] Because Plaintiff's claims are dismissed in their entirety for failure to state a claim, the Court need not address Defendants' alternative argument that Plaintiff's claims are barred by qualified immunity.  *See, e.g.*, *Aguilera v. Baca*, 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting that if no constitutional violation occurred the court need not decide whether qualified immunity applies).